FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

AUG 15 2013

DAVID J. MALAND, CLERK

BY _____
DEPUTY _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | No. 4:13CR189 |
| | § | Judge Crone |
| v. | § | |
| | § | |
| FARIDA YUSUFI | § | **FILED UNDER SEAL** |

## INDICTMENT

The Grand Jury Charges:

### Introduction

At all times material to this indictment:

1.    The defendant, **Farida Yusufi**, is a United States citizen, born in Afghanistan and residing in Collin County, Texas, which is in the Sherman Division of the Eastern District of Texas.

2.    Dari and Pashto are languages spoken in areas of Afghanistan where United States military forces are stationed.

3.    Worldwide Language Resources (WWLR) is a language services company based in Fayetteville, North Carolina, that recruits and employs linguists (also referred to as interpreters or translators) that speak Pashto and Dari to fulfill Department of Defense contracts in the United States and in Afghanistan.

Indictment - Page 1

4.     Veritiss, LLC (Veritiss) is a language services company based in Reston, Virginia, that recruits and employs linguists that speak Pashto and Dari to fulfill Department of Defense contracts in the United States and in Afghanistan.

5.     KMS Solutions, LLC (KMS) is a consulting and technical support company based in Alexandria, Virginia, that sought to recruit Pashto and Dari linguists for placement on Department of Defense contracts in both the United States and Afghanistan.

6.     Enterprise Technology Services (ETEK) is a professional technology management and support company located in Herndon, Virginia, that sought to recruit Pashto and Dari linguists for placement on Department of Defense contracts in both the United States and Afghanistan.

7.     Aveshka is a business solutions management company located in Arlington, Virginia, that recruits linguists to fulfill Department of Defense contracts in the United States and Afghanistan.

8.     AECOM is a global provider of professional technical and management support services located in Springfield, Virginia, that recruits linguists and role players to fulfill Department of Defense contracts.  AECOM also contracted with United States Special Operations Command (USSOCOM).  USSOCOM falls under the Department of Defense.  AECOM was required to provide Dari and Pashto linguists to fulfill their contract with USSOCOM.

Indictment - Page 2

9.      The Department of Defense activated USSOCOM on April 16, 1987, in response to congressional action in the Goldwater-Nichols Defense Reorganization Act of 1986 and the Nunn-Cohen Amendment to the National Defense Authorization Act of 1987.  USSOCOM is responsible for synchronizing Department of Defense plans against global terrorist networks and, as directed, conducting global operations.  USSOCOM has approximately 57,000 active duty, Reserve and National Guard Soldiers, Sailors, Airmen, Marines and Department of Defense civilians assigned to the command.

10.     FEDSYS Secure (FEDSYS) is a professional services corporation located in Jupiter, Florida, that provides operational support to government customers throughout the United States and other parts of the world.  FEDSYS acted as a sub-contractor that hired and employed recruiters and linguists for placement on Department of Defense contracts in the United States and Afghanistan.

11.     Lexicon, Inc. (Lexicon) is located in El Cajon, California, and provides language, cultural and military training to government customers, including the Department of Defense.

12.     McKellar Corporation (McKellar) is a private organization that supports U.S. government interagency missions by providing training, education and staffing. McKellar is located in Arlington and Virginia Beach, Virginia, and recruits linguists, translators and role players to fulfill Department of Defense contracts in the United States

and Afghanistan.  Role players participate in training scenarios with government

personnel to better prepare them for potential encounters in Afghanistan.

13.     International Management Services, Inc. (IMS) is a services firm that

provides training, language and facilities management for the U.S. government, allied and

coalition militaries and other industries.  IMS operates primarily out of Afghanistan, but

has an address in Rumford, Maine.  IMS recruits linguists, translators and role players to

fulfill Department of Defense contracts in the United States and Afghanistan.

14.     Monster.com is an internet company, headquartered in Maynard,

Massachusetts, that allows prospective employees to upload their resumes to the

Monster.com website and answer on-line questions about their qualifications so that

prospective employers may review the resumes and qualifications of individuals for

potential employment.  Monster.com's servers are located in Massachusetts.  In order to

create a Monster.com account, a user signs on to Monster.com and creates a profile.  A

user then uploads her resume and answers the Monster.com questions about her

qualifications and the types of employment she is seeking.  A user can designate her

profile and resume to be public, confidential or private.  A "visible" or public

resume/profile is viewable and searchable by all potential employers using Monster.com.

A "confidential" resume/profile is partially viewable by all potential employers on

Monster.com with some of the personal and biographical data only available upon

request.  A "private" resume/profile is not viewable or searchable by potential employers

on Monster.com.  One individual can create multiple profiles and each of these profiles

can have a different designation.

15.     WWLR, IMS, AECOM and others entered into contracts with the United

States Department of Defense to provide linguists or interpreters that were fluent in

Pashto and Dari.  Many of these contracts involved linguist positions embedded with

United States military forces in Afghanistan.  Other defense contracts involved positions

for Pashto and Dari speakers in the United States that were utilized as linguists and role

players in order to prepare United States military personnel for deployment to

Afghanistan.

16.     Linguist positions embedded with the U.S. military in Afghanistan

required varying levels of security clearances.  A linguist having no security clearance

was designated as a Category I or "CAT I" linguist.  A CAT I linguist was limited to

missions or positions in which no security clearance was required.  A Category II or

"CAT II" linguist position required a "SECRET" security clearance.  A Category III or

"CAT III" linguist position required a "Top Secret/Sensitive Compartmentalized

Information" or "TS/SCI" security clearance.  CAT III linguists were primarily assigned

at the Headquarters level and worked in Sensitive Compartmentalized Information

Facilities (SCIF).

17.     A large disparity in salary and in access to classified information existed

between the different categories of linguists.  The primary reason for distinguishing

category levels for linguists was to ensure information and secure access were not compromised, thus increasing force protection and overall security for U.S. military personnel.

18.     A particular linguist's security clearance level could be checked or verified by designated military and civilian personnel through a database called the Joint Personnel Adjudication System (JPAS system).  The U.S. military and defense contractors relied on the JPAS system for information about an individual's security clearance level and security incidents reported to the Central Clearance Facility (CCF) or Defense Security Service (DSS), which adjudicated the security clearance.

19.     In order for a person to be eligible for a security clearance, they must be employed by a company who will "sponsor" their security clearance request.  The person will then be placed in the JPAS system under the company's "cagecode."  A check of the JPAS system will disclose the individual's security clearance level (if any) and the company sponsoring them.  If a person's security clearance is suspended, she is ineligible to receive a security clearance, and a company who "sponsors" the individual will ultimately be alerted that the individual's clearance has been suspended.  An individual can appeal a negative action against their security clearance, but that appeal is done directly through the DSS.

**Indictment - Page 6**

20.     On August 3, 2005, **Farida Yusufi** completed a "self-assessment" of her language skills for WWLR and rated herself "high" in both Dari and Pashto for listening and speaking ability.

21.     From August 24, 2005, through September 12, 2005, **Farida Yusufi** continued the application process by filling out a United States Government Standard Form (SF) 86, which **Yusufi** signed under penalty of perjury.  She then took various language exams conducted by WWLR.

22.     The SF 86, Questionnaire for National Security Positions, is the form that is used by military personnel, government contractors, and government employees to apply for a Security Clearance.

23.     On or about September 9, 2005, **Farida Yusufi** caused to be filed an SF 86 that was submitted to the United States Government's Office of Personnel Management (OPM) via Defense Security Services by WWLR, and **Yusufi** began her employment as a linguist with WWLR on September 11, 2005.  **Yusufi** was employed with WWLR from September 11, 2005, until October 10, 2006.  During this period of employment with WWLR, **Yusufi** was embedded with U.S. military forces in Afghanistan, except for during brief periods of leave.

24.     On September 13, 2005, **Farida Yusufi** was given an interim SECRET security clearance by DSS and signed an "off post travel policy" acknowledging that she

was not allowed to leave her post unless it was approved by WWLR and her military commander. **Yusufi** was given her final SECRET security clearance on August 5, 2008.

25.     On September 16, 2005, **Farida Yusufi** received a security briefing regarding all matters surrounding and related to maintaining classified information, including Operations Security (OPSEC).

26.     Beginning on November 1, 2006, **Farida Yusufi** entered into another linguist contract with WWLR, with a scheduled end date of October 31, 2007.

27. On January 18, 2007, **Farida Yusufi** received counseling from her military commander regarding her disclosure of operational information over a non-secure telephone. **Yusufi** was advised that all operational information regarding dates/times, locations, units and activities of U.S. and coalition forces is classified.

28.     On May 21, 2007, a Memorandum For Record (MFR) was made when a commander of the U.S. Special Forces unit with which **Farida Yusufi** was working questioned her trustworthiness and integrity because **Yusufi**: (1) refused to translate Dari as directed; (2) verbally harassed another female linguist; and (3) and due to her limited language skills, caused inaccuracies in sensitive reporting and degradation of source rapport.

29.     On May 24, 2007, **Farida Yusufi** was counseled by WWLR based on the May 21, 2007 MFR.  On or about May 26, 2007, **Yusufi** provided a written, signed response to the WWLR counseling.

30.     On July 10, 2007, a commanding officer with the United States Army issued a counseling letter to **Farida Yusufi** in which she was counseled for a number of issues, including: (1) for allowing her personal thumb drive with a virus on it to be transferred to a government computer; (2) for using her personal laptop instead of her government-issued laptop for official correspondence; (3) for a conversation that she had with a Provincial Reconstruction Team (PRT) member about enemy threats; and (4) for communicating with local Afghan nationals outside the scope of her assignments.

31.     On July 17, 2007, **Farida Yusufi** responded to the officer's counseling letter.

32.     On August 8, 2007, **Farida Yusufi** participated in a U.S. Army Counterintelligence (CI) interview.  **Yusufi** decided to return to the United States to have dental work performed prior to submitting to a second CI interview and polygraph examination.

33.     On August 17, 2007, **Farida Yusufi's** contract with WWLR was terminated under "unfavorable" circumstances.

34.     Beginning on July 12, 2008, **Farida Yusufi** entered another employment contract as a linguist with WWLR.  **Yusufi** was stationed at Bagram Air Base and other military outposts in Afghanistan during this period of employment with WWLR.

35.     On or about April 23, 2009, **Farida Yusufi** was interviewed by U.S. Army CI and terminated for potential security concerns.

36.     On April 25, 2009, **Farida Yusufi** sent an email to WWLR stating that she was terminated by U.S. Army Counterintelligence personnel for alleged security violations and disputing the facts surrounding her termination. **Yusufi** departed Afghanistan for the United States on or about April 30, 2009; however, **Yusufi** was still under contract with WWLR at this time.

37.     On June 1, 2009, **Farida Yusufi** was officially terminated under "unfavorable" circumstances by WWLR through its affiliate Shee Atika Languages, due to security issues.

38.     On July 30, 2009, **Farida Yusufi** caused to be filed an electronic SF 86 via the internet that was submitted to OPM. In the SF 86, **Yusufi** made false statements related to the termination of her employment by answering "no" to the following questions under Section 13C:

"1.     Has any of the following happened to you in the last seven years?

    a. Fired from a job

    b. Quit a job after being told you would be fired

    c. Left a job by mutual agreement following charges or allegations of misconduct

    d. Left a job by mutual agreement following notice of unsatisfactory performance

    e. Left a job for other reasons under unfavorable circumstances"

**Indictment - Page 10**

39.     On October 27, 2009, **Farida Yusufi** was interviewed regarding her SF 86 and she confirmed the accuracy of her answers to the questions.  **Yusufi** told the interviewer that she left WWLR in 2009, in order to spend more time with her family in the United States.

40.     On October 1, 2009, Defense Security Service (DSS), located in Columbus, Ohio, gave **Farida Yusufi** written notification by mail that her security clearance had been suspended.  Once an individual's security clearance has been suspended, they are no longer permitted to have access to classified information.

41. At no time after **Farida Yufufi's** SECRET security clearance was suspended on October 1, 2009, was her clearance re-activated or reinstated.

42.     **Farida Yusufi** has never possessed a Top Secret or Top Secret/Sensitive Compartmentalized Information (TS/SCI) security clearance.

43.     A Letter of Authorization (LOA) is the military contractor equivalent of military orders.  The Department of Defense (DOD) requires all U.S. military contractors being deployed to Afghanistan to possess an LOA.  LOAs enable the person named in the LOA to board military aircraft and allow the named bearer access to U.S. military bases and facilities in Afghanistan and elsewhere.

44.     LOAs bear a unique Control Number.  An LOA bearing Control Number: DD201 was issued by USSOCOM to "Yama Turyalai Safi."  The "date of request" for

LOA DD201 was February 17, 2009, and the LOA was electronically signed on February 20, 2009.  Safi is an associate of **Farida Yusufi**.

45.     On or about January 18, 2010, **Farida Yusufi** created or caused to be created a fraudulent LOA, bearing Control Number: DD201, purportedly issued to **Yusufi**, bearing a "date of request" of December 17, 2009.  On or about March 13, 2013, **Yusufi** possessed a hard copy and electronic version of this fraudulent LOA.

46.     On or about March 13, 2013, **Farida Yusufi** possessed an electronic version of a fraudulent LOA, bearing the Control Number: DD201 and purportedly issued to **Yusufi**.  This electronic version bore the "date of request" of February 17, 2009.

47.     On or before August 15, 2007, while in Afghanistan, **Farida Yusufi** downloaded a U.S. Army document, bearing a "modification date" of March 31, 2007, which was entitled "leave dates" onto an unknown device.  The "leave dates" document is the property of the U.S. Army and the Department of Defense and detailed the leave dates for all members of the Qalat Provincial Reconstruction Team (PRT) serving in Afghanistan for a six-month period.  **Yusufi** did not have authority to take or possess this document or the information contained in the document.

48.     On or before August 15, 2007, while in Afghanistan, **Farida Yusufi** downloaded a U.S. Army document, bearing a "modification date" of April 9, 2007, which was entitled "updated sensitive items" onto an unknown device.  The "updated sensitive information" document is the property of the U.S. Army and the Department of

Defense and detailed personnel and weapons assignments for the Qalat PRT Unit serving in Afghanistan.  **Yusufi** did not have authority to take or possess this document or the information contained in the document.

49.     On or about April 20, 2008, **Farida Yusufi** saved an Army Counter-Intelligence manual (CI Manual) onto her personal laptop.  This Manual was available on the Internet and provided information on espionage, subversion, counter-intelligence and security.  The Manual details information that is of particular interest to the enemy, including weapons capabilities and personnel information.  The Manual also discusses determining how vulnerable a particular base is by evaluating the "pass system" and obtaining entry to bases, including determining whether base passes can be duplicated.

50.     On or about April 23, 2009, while in Afghanistan, **Farida Yusufi** uploaded the documents entitled "leave dates" and "updated sensitive information" onto her personal laptop and saved those documents in a file entitled "thumbdrive."  These documents were the property of the U.S. Army and Department of Defense, and **Yusufi** did not have authority to possess the documents.  On this date, **Yusufi** also accessed the CI Manual on her personal laptop.

51.     On or about March 13, 2013, **Farida Yusufi** was in possession of her laptop and a hard drive containing the documents entitled "leave dates" and "updated sensitive information," which are the property of the U.S. Army and Department of

Defense and which **Yusufi** did not have the authority to possess.  The unknown device from which **Yusufi** uploaded the documents onto her laptop was never recovered.

The Scheme and Artifice to Defraud

52.    After **Farida Yusufi's** security clearance was suspended, **Yusufi** continued to seek employment with defense contractor-related companies.

53.    It was part of **Farida Yusufi's** scheme and artifice to defraud that, even after her security clearance had been suspended, she continued to represent to potential employers that she had a "TOP SECRET Security Clearance in processing/Active Final Secret Clearance including CI polygraph."

54.    As part of the scheme and artifice to defraud, **Farida Yusufi** utilized the internet to distribute her resume, which contained false and fraudulent representations about her security clearance in order to gain access to information and to obtain increased pay or salary to which she was not entitled.  **Yusufi** used Monster.com to upload her false resume onto the Monster.com website and make the false resume available to employers searching for Pashto and Dari linguists with a security clearance.  **Yusufi** also utilized her Yahoo.com email address to distribute her false resume and make false representations about her clearance to potential employers.

55.    On October 2, 2009, **Farida Yusufi** signed an employment offer letter to work as a recruiter for Veritiss, a position that did not require a security clearance. **Yusufi** worked as a recruiter for Veritiss until January 2011, when Veritiss learned that

**Yusufi** had taken a position at another company without notifying Veritiss and had been working as a recruiter at both companies simultaneously in violation of her Veritiss contract. At that time, Veritiss notified **Yusufi** that they were aware of her violations and permitted **Yusufi** to resign in lieu of being fired.

56. On February 5, 2010, **Farida Yusufi** emailed her resume to KMS seeking employment with KMS as a linguist. **Yusufi**'s resume falsely and fraudulently stated that **Yusufi** possessed a "TOP SECRET Security Clearance in processing/Active Final Secret Clearance including CI polygraph."

57. In furtherance of the scheme and artifice to defraud, on December 14, 2009, two months after her SECRET clearance had been suspended, **Farida Yusufi** uploaded her resume to Monster.com via the internet and designated her profile "visible."

58. Nearly eleven months later, on September 28, 2010, at 12:16 p.m., **Farida Yusufi** again accessed her Monster.com profile and resume (hereinafter Monster.com resume). **Yusufi**'s resume falsely and fraudulently stated that **Yusufi** possessed a "TOP SECRET Security Clearance in processing/Active Final Secret Clearance including CI polygraph," misstated her Veritiss work experience, and stated that she was fluent in Dari. **Yusufi** also falsely answered questions generated by Monster.com entitled "resume settings." Specifically, **Yusufi** responded via the internet that she had an "active secret clearance." **Yusufi** also listed her preferred occupations as (1) airport security and screening, (2) customs and immigration, and (3) military combat.

59.     Later that same day, at approximately 2:00 p.m., **Farida Yusufi** was interviewed at her home in Plano, Texas, by agents with the Federal Bureau of Investigation (FBI) in connection with her security clearance.  During this interview, **Yusufi** admitted knowing that her security clearance was suspended in 2009, and never reinstated.

60.     Approximately two weeks later, on October 12, 2010, **Farida Yusufi** was again interviewed at her home in Plano, Texas, by FBI agents.  During this interview, **Yusufi** provided the agents with a copy of the DSS letter dated October 1, 2009, that notified her that her clearance was suspended.

61.     In furtherance of the scheme and artifice to defraud, in or around November 2010, ETEK received **Farida Yusufi**'s resume, in which she represented she had a security clearance, from a headhunting firm that located her on Monster.com. **Yusufi** again stated to ETEK that she had an active security clearance, when in fact, it had been suspended for over a year.  **Yusufi** then forwarded her resume to ETEK via email.  **Yusufi's** resume stated that she had a "TOP SECRET Security Clearance in processing/Active Final Secret Clearance including CI polygraph" and that she had an "active secret clearance."  ETEK began working to secure **Yusufi** a linguist position with Aveshka.  ETEK forwarded **Yusufi's** Monster.com resume to Aveshka on or about November 15, 2010, but ultimately terminated their efforts on **Yusufi's** behalf on or after January 27, 2011.

62.     In furtherance of the scheme and artifice to defraud, on or about December 15, 2010, AECOM accessed **Farida Yusufi's** Monster.com resume on the Monster.com website and slated her for a position as a Dari/Pashto linguist on a USSOCOM contract. Before **Yusufi** was offered the position, AECOM learned of **Yusufi's** security issues and did not offer her a linguist position. Instead, AECOM entered into an "independent consultant" agreement with **Yusufi**, which she signed on January 3, 2011. Under the independent consultant agreement, **Yusufi** was to perform recruiting services for AECOM. AECOM was unaware that **Yusufi** was already performing recruiting services for Veritiss.

63.     The AECOM contract violated **Farida Yusufi's** employment contract with Veritiss and she was allowed to resign from Veritiss in January 2011, before she was terminated.

64.     In furtherance of the scheme and artifice to defraud, on February 8, 2011, **Farida Yusufi** submitted her resume to FEDSYS in furtherance of gaining employment, which falsely stated that she possessed a "TOP SECRET Security Clearance in processing/Active Final Secret Clearance including CI polygraph," to FEDSYS.

65.     On February 14, 2011, **Farida Yusufi** sent an email to FEDSYS asking FEDSYS to sponsor her security clearance and falsely stating "my final TS clearance is in adjudication process . . . It will take a few months to hear from Army CCF . . . ."

66.     On February 16, 2011, **Farida Yusufi** sent an email to FEDSYS thanking

Indictment - Page 17

the representative for talking with her and forwarding documents FEDSYS requested.

Included in the documents **Yusufi** emailed to FEDSYS were her resume, a number of

letters of recommendation and her reply to DSS regarding the incident report that had

been filed on her.  One of the letters **Yusufi** attached to the email, purporting to be from

a commander of the United States Navy, was fraudulent and contained a forged signature

of that United States Navy Commander.  Additionally, in the email, **Yusufi** indicated that

she was unsure about what actually generated the incident report, and only assumed that

her letter addressed the actual incident.  **Yusufi** further touted her linguist skills and

bravery and stated that her goal was to return to Afghanistan even as a CAT I linguist.  As

a result of these communications, FEDSYS agreed to "sponsor" **Yusufi's** clearance.

67.     On March 30, 2011, **Farida Yusufi** signed the FEDSYS

employment offer in McKinney, Texas, and returned it to FEDSYS via email.

68.     On March 24, 2011, **Farida Yusufi** submitted application documents to

Lexicon in an attempt to gain employment with Lexicon as an interpreter.  Included in the

application documents was a "Declaration of Federal Employment," which was signed by

**Yusufi** on March 24, 2011, stating that she had never been fired from a job for any reason

and that she had never quit a job after being told she would be fired.  In support of her

application, **Yusufi** also submitted information for the completion of her Standard Form

(SF)-85p, falsely stating that she had never had her clearance suspended or revoked and

stating that she had never been fired from a job, that she had never quit a job after being

told she would be fired, and that she had never left a job by mutual agreement following allegations of misconduct.  On March 29, 2011, Lexicon sent **Yusufi** finger print cards via the United States Postal Service to further the employment process.

69.    On May 25, 2011, Veritiss sent a letter to FEDSYS via Federal Express stating that **Farida Yusufi** had violated the non-compete clause in her employment agreement with Veritiss.  As a result, FEDSYS sent a letter to **Yusufi** at her home in McKinney, Texas, terminating her employment with FEDSYS.

70.    In furtherance of the scheme and artifice to defraud, on March 9, 2011, while in Oklahoma at a U.S. military base and training facility, **Farida Yusufi** emailed her resume to a recruiter for McKellar working in Fairfax, Virginia.  **Yusufi's** resume falsely and fraudulently stated that she had a "TOP SECRET Security Clearance in processing/Active Final Secret Clearance including CI polygraph."

71.    During March 2011, **Farida Yusufi** spoke with representatives of McKellar over the telephone and confirmed that her resume was current and accurate.

72.    On March 25, 2011 and March 30, 2011, **Farida Yusufi** sent emails from her home in McKinney, Texas, to McKellar in Fairfax, Virginia, confirming her employment as a role player and making travel arrangements to and from a McKellar training site in Indiana.

**Indictment - Page 19**

73.     Based on **Farida Yusufi's** false representations about her clearance,

McKellar hired **Yusufi** as an "interpreter w/ clearance" for Foreign Service Institute (FSI)

Department of State training.

74.     On April 9, 2011, **Yusufi** traveled from McKinney, Texas, to Indiana, and

signed her contract with McKellar.  **Yusufi** worked on the FSI contract at the

Muscatatuck Urban Training Center in Indiana from April 10 through April 14, 2011.

The Muscatatuck Urban Training Center is a Department of Defense facility designed to

prepare U.S. military Special Forces troops for deployment to Southwest Asia.  McKellar

paid **Yusufi** at the rate of an interpreter with a clearance and issued her a check in the

amount of $3,000.00.  In turn, McKellar billed the government for the rate of an

interpreter with a security clearance.

75.     On April 15, 2011, **Farida Yusufi** signed a McKellar invoice indicating

she had a security clearance.

76.     From May 22, 2011, through May 31, 2011, **Farida Yusufi** again worked

for McKellar.  On May 31, 2011, a security officer with McKellar informed the McKellar

president that a JPAS search revealed **Yusufi** had an incident report and access

suspension.  McKellar paid **Yusufi** $2,500.00 for her work as a "skilled role player" for

this period.

77.     In furtherance of the scheme and artifice to defraud, on May 5, 2011,

**Farida Yusufi** told Aveshka via a telephone call that her security clearance issue had

been resolved, but that the government needed to update the JPAS system.  Aveshka then sent an employment offer letter to **Yusufi**.  **Yusufi's** Monster.com resume had been accessed on Monster.com by two consulting or "scouting" firms and ultimately forwarded to Aveshka as a potential Pashto linguist candidate based on the contents of her Monster.com resume.  One contingency of Aveshka's employment offer was that **Yusufi** be eligible to obtain a security clearance.

78.     On May 12, 2011, **Farida Yusufi** accepted and signed Aveshka's employment offer and returned the offer letter to Aveshka.  **Yusufi's** clearance remained suspended and Aveshka ultimately did not hire her.

79.     In furtherance of the scheme and artifice to defraud, on June 6, 2011, **Farida Yusufi** emailed a representative of IMS seeking to deploy to Afghanistan as a Category I linguist under a North Atlantic Treaty Organization (NATO) contract.  In her email, **Yusufi** stated that her current resume was attached.  The resume attached to the email falsely stated that **Yusufi** possessed a "TOP SECRET Security Clearance in processing/Active Final Secret Clearance including CI polygraph."

80.     On June 13, 2011, **Farida Yusufi** signed an employment agreement with IMS and emailed the signed agreement to IMS.

81.     On June 13, 2011, **Farida Yusufi** deployed to Afghanistan with IMS and was assigned to work with U.S. Special Forces.  **Yusufi** was embedded with a U.S. Special Forces unit in the Urzugan Province of Afghanistan.

82.     On September 16, 2011, **Farida Yusufi** was interviewed in Afghanistan by

a U.S. Army Counterintelligence (CI) Special Agent.  During that interview, **Yusufi**

falsely stated to the Special Agent that she had a Top Secret security clearance and that

she had never been fired from a job.  As a result of that interview, IMS terminated **Yusufi**

as a contract linguist and sent her back to the United States.

83.     In furtherance of the scheme and artifice to defraud, on November 9, 2012,

**Farida Yusufi** created a private profile on Monster.com.  **Yusufi** also answered questions

about her qualifications, stating that she had an "active secret clearance."

84.     As of February 13, 2013, **Farida Yusufi's** Monster.com profile containing

her resume states she possesses a "TOP SECRET Security Clearance in processing/Active

Final Secret Clearance including CI polygraph," and she claims in her resume settings on

her Monster.com profile that she possesses an "active secret clearance." This profile was

still listed as publicly viewable and had been accessed 113 times between September 28,

2010, and January 15, 2013.

[NOTHING FURTHER ON THIS PAGE].

<u>Count One</u>
Wire Fraud
(Violation of 18 U.S.C. § 1343)

85.    The Grand Jury realleges and incorporates by reference paragraphs 1-84 of the Introduction and Scheme and Artifice to Defraud sections to this indictment as though fully set forth herein.

86.    On or about September 28, 2010, in the Sherman Division of the Eastern District of Texas, and elsewhere, the defendant, **Farida Yusufi**, for the purpose of executing and carrying out the aforesaid scheme and artifice to defraud and to obtain money and property from various defense contractors,  subcontractors and recruiting firms, including AECOM, ETEK and others, by means of materially false and fraudulent pretenses, representations, and promises, did knowingly and with the intent to defraud transmit and cause to be transmitted in interstate commerce, by means of wire and radio communications, certain writings, signs, signals and sounds constituting an upload of **Yusufi's** resume and statements of qualifications onto Monster.com, located in Maynard, Massachusetts.

In violation of 18 U.S.C. § 1343.

<u>Count Two</u>
False Statement to a Federal Agency
(Violation of 18 U.S.C. § 1001)

87.    The Grand Jury realleges and incorporates by reference paragraphs 1-84 of the Introduction and Scheme and Artifice to Defraud sections to this indictment as though fully set forth herein.

88.    On or about September 16, 2011, during an investigation conducted at a United States military base in Afghanistan,  the defendant, **Farida Yusufi**, did knowingly make and cause to be made materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the United States Army, by falsely stating to federal law enforcement agents that she possessed a Top Secret security clearance.

In violation of 18 U.S.C. § 1001.

<u>Count Three</u>
False Statement to a Federal Agency
(Violation of 18 U.S.C. § 1001)

89.     The Grand Jury realleges and incorporates by reference paragraphs 1-84 of the Introduction and Scheme and Artifice to Defraud sections to this indictment as though fully set forth herein.

90.     On or about September 16, 2011, during an investigation conducted at a United States military base in Afghanistan, the defendant, **Farida Yusufi**, did knowingly make and cause to be made materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the United States Army, by falsely stating to federal law enforcement agents that she had never been fired from a job.

In violation of 18 U.S.C. § 1001.

Count Four
False Statement to a Federal Agency
(Violation of 18 U.S.C. § 1001)

91.     The Grand Jury realleges and incorporates by reference paragraphs 1-84 of

the Introduction and Scheme and Artifice to Defraud sections to this indictment as though

fully set forth herein.

92.     On or about March 22, 2012, in the Sherman Division of the Eastern

District of Texas,  the defendant, **Farida Yusufi**, did knowingly make and cause to be

made materially false, fictitious and fraudulent statements and representations in a matter

within the jurisdiction of the Federal Bureau of Investigation, by falsely stating to federal

law enforcement agents that she had never denied on any form that her security clearance

had been suspended.

In violation of 18 U.S.C. § 1001.

<u>Count Five</u>
False Statement to a Federal Agency
(Violation of 18 U.S.C. § 1001)

93.    The Grand Jury realleges and incorporates by reference paragraphs 1-84 of

the Introduction and Scheme and Artifice to Defraud sections to this indictment as though

fully set forth herein.

94.    On or about March 22, 2012, in the Sherman Division of the Eastern

District of Texas, the defendant, **Farida Yusufi**, did knowingly make and cause to be

made materially false, fictitious and fraudulent statements and representations in a matter

within the jurisdiction of the Federal Bureau of Investigation, by falsely stating to federal

law enforcement agents that she had never worked for AECOM.

In violation of 18 U.S.C. § 1001.

<u>Count Six</u>
False Statement to a Federal Agency
(Violation of 18 U.S.C. § 1001)

95.     The Grand Jury realleges and incorporates by reference paragraphs 1-84 of

the Introduction and Scheme and Artifice to Defraud sections to this indictment as though

fully set forth herein.

96.     On or about February 23, 2012, in the Sherman Division of the Eastern

District of Texas, the defendant, **Farida Yusufi**, did knowingly make and cause to be

made materially false, fictitious and fraudulent statements and representations in a matter

within the jurisdiction of the Federal Bureau of Investigation, by falsely stating to federal

law enforcement agents that she had not applied for a role player or linguist position since

her return from Afghanistan in September 2011.

In violation of 18 U.S.C. § 1001.

<u>Count Seven</u>
Altering a Military, Naval or Official Pass
(Violation of 18 U.S.C. § 499)

97.     The Grand Jury realleges and incorporates by reference paragraphs 1-84 of

the Introduction and Scheme and Artifice to Defraud sections to this indictment as though

fully set forth herein.

98.     On or about January 18, 2010, in the Sherman Division of the Eastern

District of Texas, the defendant, **Farida Yusufi**, did falsely make, forge, counterfeit, alter

and tamper with, and with intent to defraud, did possess a falsely made, forged,

counterfeited and altered military or official pass issued under the authority of the United

States, that is a falsely made, forged, counterfeited and altered Letter of Authorization

(LOA) issued by or under the authority of the United States government.

In violation of 18 U.S.C. § 499.

<u>Count Eight</u>
Altering a Military, Naval or Official Pass
(Violation of 18 U.S.C. § 499)

99.     The Grand Jury realleges and incorporates by reference paragraphs 1-84 of the Introduction and Scheme and Artifice to Defraud sections to this indictment as though fully set forth herein.

100.    On or about March 13, 2013, in the Sherman Division of the Eastern District of Texas, and elsewhere, the defendant, **Farida Yusufi**, did falsely make, forge, counterfeit, alter and tamper with, and with intent to defraud, did possess one or more falsely made, forged, counterfeited and altered military or official passes issued under the authority of the United States, that is one or more falsely made, forged, counterfeited and altered Letter of Authorizations (LOA) issued by or under the authority of the United States government.

In violation of 18 U.S.C. § 499.

<u>Count Nine</u>
Theft of Government Records with Intent to Convert to Personal Use
(Violation of 18 U.S.C. § 641)

101.    The Grand Jury realleges and incorporates by reference paragraphs 1-84 of the Introduction and Scheme and Artifice to Defraud sections to this indictment as though fully set forth herein.

102.    Beginning on or about April 23, 2009 and continuing up until March 13, 2013, in the Eastern District of Texas, and elsewhere, the defendant, **Farida Yusufi**, did willfully and knowingly conceal and retain records of the United States Department of Defense and the United States Department of the Army, agencies or departments of the United States government with intent to convert those records to her personal use, knowing the records to have been stolen, purloined, or converted.

In violation of 18 U.S.C. § 641.

**Indictment - Page 31**

A TRUE BILL

SW
_____
FOREPERSON

JOHN M. BALES
UNITED STATES ATTORNEY


J. MARK PENLEY
Special Assistant U.S. Attorney- EDTX
Assistant U.S. Attorney- NDTX
Texas State Bar No. 15750700
1100 Commerce St., Suite 300
Dallas, Texas 75242-1699
Telephone: 214.659.8600
Facsimile: 214.767.2846
mark.penley@usdoj.gov

ERRIN MARTIN
Special Assistant U.S. Attorney-EDTX
Assistant U.S. Attorney-NDTX
Texas State Bar No. 24032572
1100 Commerce St., Suite 300
Dallas, Texas 75242
Telephone: 214.659.8838
Errin.Martin@usdoj.gov

JAMES E. PEACOCK
Assistant United States Attorney
Texas State Bar No. 00791419
600 East Taylor St., Suite 2000
Sherman, Texas 75090
Telephone: 903.813.5313
James.Peacock@usdoj.gov


**Indictment - Page 32**

JOLIE F. ZIMMERMAN
Trial Attorney
DC Bar #165110
Counterterrorism Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
202.514.1453
202.514.8714 (fax)
jolie.zimmerman@usdoj.gov

ROBERT E. WALLACE, JR.
D.C. Bar No. 991822
Senior Trial Attorney
Counterespionage Section, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 233-0986
Robert.Wallace@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No.  4:13CR_____ |
| v. | § | Judge _____ |
| | § | |
| FARIDA YUSUFI | § | **FILED UNDER SEAL** |

---

## NOTICE OF PENALTY

---

### COUNT ONE

Violation:          18 U.S.C. § 1343
                    Wire Fraud

Penalty:            A fine of not more than $250,000.00
                    and/or imprisonment for not more
                    than twenty (20) years; and a period
                    of supervised release of not more
                    than three (3) years.

Special Assessment: $100.00

### COUNTS TWO THROUGH SIX

Violation:          18 U.S.C. § 1001
                    False Statement to a Federal Agency

Penalty:            A fine of not more than $250,000.00
                    and/or imprisonment for not more
                    than five (5) years; and a period of
                    supervised release of not more than
                    three (3) years.

Special Assessment: $100.00

**Indictment - Page 34**

## COUNTS SEVEN AND EIGHT

Violation:          18 U.S.C. § 499
Altering a Military, Naval or Official Pass

Penalty:            A fine of not more than $250,000.00
and/or imprisonment for not more
than five (5) years; and a period of
supervised release of not more than
three (3) years.

Special Assessment:  $100.00

## COUNT NINE

Violation:          18 U.S.C. § 641
Theft of Government Records with Intent to Convert to
Personal Use

Penalty:            A fine of not more than $250,000.00
and/or imprisonment for not more
than five (5) years; and a period of
supervised release of not more than
three (3) years.

Special Assessment:  $100.00

**Indictment - Page 35**